IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY WINTERS ROGERS, | No. C 09-02573 SI |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security | |
| Defendant. | |

Plaintiff Tracy Rogers filed this action seeking review of a decision to deny her Supplemental Security Income ("SSI") benefits by the Social Security Administration ("SSA"). The parties have filed cross-motions for summary judgment. Having considered the parties' papers and the administrative record, the Court hereby DENIES plaintiff's motion for summary judgment and GRANTS defendant's motion for summary judgment.

**BACKGROUND**

**I.     Factual Background**

At the time of her application, plaintiff was a 44 year old Caucasian woman. Administrative Record ("AR") at 25. Her physical health problems include hepatitis C, cirrhosis of the liver, and abdominal pain related to ulcers or recurring urinary tract infections. *Id*. at. 20-21, 400. Plaintiff does not have a high school diploma and quit school in 9th grade when she had her first child. *Id*. at 44. She has a history of psychological problems that she attributes to the fact that when plaintiff was 16 years old, her mother shot her father six times, which paralyzed and later killed her father. *Id*. at 400.

Additionally, plaintiff has a history of addiction to heroin, which she described as a $100/day habit. *Id*. at 39. From the ages of 17 to 45, plaintiff testified that she has been in prison almost every year for crimes that she describes as "mostly shoplifting" to fund her heroin habit. *Id*. at 38-39. While in prison, she continued to use heroin, and was released on parole eight months prior to her SSI application.

Plaintiff has a limited work history, working last at a thrift shop in 2000 before being terminated for providing a "discount" on merchandise to family. *Id*. at 37. Prior to that, plaintiff worked at Mervyn's Warehouse and then "did window blinds." *Id*. at 35. She attributes her limited work history to the fact that "[m]y whole life, I've been in prison really." *Id*.

Plaintiff lives with her grandmother and granddaughter. Her daughter was in jail at the time of plaintiff's SSI application, and was scheduled to be released in June 2007. In her ordinary day, plaintiff wakes up at 5am, takes a shower, puts on her makeup, gets her granddaughter ready for school and then takes her to school. *Id*. at 42. Afterwards, she takes care of her grandmother, feeding her things like applesauce and providing water. *Id*. Her grandmother recently got out of the hospital and has limited mobility. *Id*. Plaintiff testified that caring for her grandmother is "really, really hard." *Id*. At the end of her day, plaintiff picks up her granddaughter from school, and then brings her home. *Id*. at 44. Later, plaintiff makes "hot dogs or something for dinner." *Id*. During the day, plaintiff concedes that she does "housekeeping, vacuuming, [and] laundry" but that such activities are a "strain on my health" and that "[t]he house is a never ending thing and there's always something to do."[1] *Id*. Plaintiff does not believe she will go back to work anytime soon. *Id*.

Several medical experts reviewed plaintiff's psychological and physical health. Dr. Ranald Bruce concluded that "Ms. Rogers has some depression but it is not clear it is serious or disabling." *Id*. at 209. Additionally, her "[l]imited adjustment and history of substance abuse and incarceration suggest personality disorder." *Id*. Although the IQ test administered by Dr. Bruce revealed plaintiff had an IQ of 64, he determined that her "[t]esting was compromised and actual intellectual memory abilities are probably in the low average range." Accordingly, he concluded that plaintiff:

---

[1] In a third party report submitted to the Administrative Law Judge ("ALJ"), plaintiff's grandmother wrote that plaintiff "cleans [the] house, takes shower, gets ready for the day, gets daughter ready for school, and makes breakfast for me and granddaughter, waits till neighbor picks granddaughter to go to school then she goes to the methadone clinic and then comes home." *Id*. at 113.

2

> . . . could carry out simple, detailed and complex instructions in an average work setting. She could have problems cooperating with workers due to personality disorder. She has no psychological limitations in the areas of common daily activities or in social relationships. She should not have problems with concentration and attention in an average work setting. She could have problems with persistence and pace due to fatigue related to Hepatitis C.

*Id*. at 209-210. Additionally, he concluded that she has "adequate arithmetic skills to conduct simple monetary transactions." *Id*. at 210.

Plaintiff's own medical expert, Dr. Michael Wolfe, found that plaintiff scored a 71 on the IQ test. AR at 401. In Dr. Wolfe's tests, plaintiff showed an ability to retain information in the 4th percentile. *Id*. at 403. In contrast to Dr. Bruce, Dr. Wolfe determined that plaintiff's "performance did not suggest malingering" or exaggeration of symptoms. *Id*. Accordingly, he found that she had borderline intellectual ability, difficulty shifting her mental focus, and an impaired ability to learn new information. *Id*. at 405. Additionally, Dr. Wolfe stated that plaintiff showed signs of depression and anxiety, and has limited resources for coping with ordinary stresses and demands of everyday life. *Id*. Thus, plaintiff "is likely to act in ways that are surprisingly inappropriate for the situation and exhibit poor impulse control and bad judgment." *Id*.

When the ALJ questioned the vocational expert, he asked about the skill level of plaintiff's past work. *Id*. at 50. The vocational expert replied that when she functioned as a clothes hanger, it was unskilled and light labor, and while as a cashier she was semiskilled, pointing to Dictionary of Occupational Titles ("DOT") 299.677-010. *Id*. The ALJ then provided two hypotheticals to the vocational expert based on the following assumptions: (1) assume a person "can have no more than occasional contact with coworkers," and (2) assume that "the person can have no more than occasional interaction with supervisors or the general public and cannot understand, remember or carry out detailed or complex instructions." *Id*. at 51, 53. As to the first hypothetical, the vocational expert suggested jobs like an unarmed night watchman (or alarm security guard, gate guard, lobby guard), DOT 372.667-030, and an assembler, DOT 706.684-022, would be appropriate. The vocational expert asserted that such jobs require some interaction with a supervisor but the hypothetical worker could choose whether or not to interact with fellow employees. *Id*. at 52. In response to the second hypothetical, the vocational expert stated that the new assumptions "wouldn't change my opinion." The ALJ did not ask the

vocational expert any questions related to IQ and borderline intellectual ability. Finally, the ALJ applied the five-step sequential evaluation procedure set forth under 20 C.F.R. § 416.920(a)(4). At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 22, 2005. AR at 19. Second, plaintiff has the severe impairments of opioid abuse/dependence, and personality disorder (NOS) (probable). *Id*. Third, the ALJ found that the plaintiff does not have an impairment that meets one of the listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 21. Fourth, the ALJ found that plaintiff had the "residual functional capacity to perform work at any level of exertion, but she may have no more than occasional contact with co-workers, no more than occasional interaction with a supervisor or the general public, and she cannot understand, remember, or carry out detailed instructions. In all other respects, claimant is not functionally limited." *Id*. at 22. Fifth, the ALJ found that the SSA met its burden in showing that plaintiff could perform other work based upon plaintiff's residual functioning capacity ("RFC"). In particular the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." AR at 25.

## II.     Procedural Background

On July 7, 2005, plaintiff applied for SSI benefits under the Social Security Act. The Commissioner denied plaintiff's application on November 4, 2005 and upon reconsideration on March 25, 2006. *Id*. at 60, 68. Plaintiff requested a hearing and appeared before ALJ Steven B. Berlin on March 7, 2007. On March 27, 2007, the ALJ denied plaintiff's benefits claim. On June 10, 2009, after an appeals council declined review, plaintiff filed this action for judicial review of the ALJ's decision.

**STANDARD OF REVIEW**

This action comes before the Court for judicial review pursuant to 42 U.S.C. § 405(g) of the Social Security Act. The statute authorizes judicial review "after any final decision of the Commissioner of Social Security." 42 U.S.C. § 405(g). The Court may conduct only a limited review of the final decision and may disturb the decision "only if it is not supported by substantial evidence or if it is based on legal error." *Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005) (citation and internal quotation omitted). Substantial evidence means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Even if substantial evidence supports the ALJ's factual findings, the decision must be set aside if improper legal standards were applied in reaching that decision. *See Frost v. Barnhart*, 314 F.3d 359, 367 (9th Cir. 2002).

**DISCUSSION**

**I.   Substantial Evidence for RFC Conclusion**

Plaintiff contends that the ALJ did not have substantial evidence to support his RFC conclusion. The ALJ's RFC provided that plaintiff could work at any level of exertion, but with no more than occasional contact with coworkers, no more than occasional interaction with supervisors and the general public, and that she cannot carry out complicated or detailed instructions. AR at 22. Plaintiff makes five arguments: (1) the ALJ should have included the borderline intellectual ability revealed in her IQ tests as part of the RFC determination, (2) the ALJ should have posed hypotheticals to the vocational expert which included borderline intellectual ability, (3) the ALJ should have discounted Dr. Bruce's opinion that plaintiff gave a compromised effort on her IQ test, (4) the ALJ should not have given limited weight to Dr. Wolfe's opinion that her IQ scores showed no malingering, and (5) the ALJ failed to provide proper credibility findings when he allegedly rejected plaintiff's testimony without specific and legitimate reasons.

**A.   Conflicting Medical Testimony on Borderline Intellectual Functioning**

Plaintiff asserts that her RFC was much lower than the ALJ's determination, and should have included borderline intellectual functioning with mild to moderate impairment. Plaintiff argues that because "[t]here is no objective basis to support Dr. Bruce's validity conclusion," the ALJ should have discounted Dr. Bruce's conclusion that plaintiff provided a compromised effort on her IQ test. Additionally, plaintiff argues that Dr. Wolfe's test results "bolster the earlier [IQ] test results documented by Dr. Bruce" and show that there was no malingering. Mtn. at 5. Defendant asserts that Dr. Bruce's opinion alone constitutes substantial evidence, and that where the ALJ is faced with conflicting conclusions between medical experts "the ALJ had the duty to resolve the conflicts and

5

determine Plaintiff's RFC." Opp. at 3.

It is not the function of this Court to resolve conflicts of evidence that are appropriately reserved for the trier of fact. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041, 1042 (9th Cir. 2008). The ALJ's conclusions are given deference in part because the ALJ is "the individual optimally positioned to observe and assess witness credibility." *Casias v. Secretary of Health and Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991). It is within the responsibility of the ALJ to determine "whether inconsistencies are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount the opinions" of medical experts. *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999). Accordingly, the trier of fact's conclusions are determinative so long as those conclusions are supported by substantial evidence. *Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Substantial evidence is defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Id*. at 1230.

Here, Dr. Bruce's medical conclusion was that plaintiff gave a compromised effort on her IQ test, and that her actual intellectual capacity was likely in the "low average" range. AR at 209. The ALJ discounted Dr. Wolfe's opinion in part because "[h]e is not a treating source and was selected by the claimant" but more importantly because "the claimant repeatedly misinformed him, especially about her drug use." *Id*. at 20. In particular, plaintiff informed Dr. Wolfe that she had been on methadone for years and that her drug use was in the past, but only three days later at her hearing before the ALJ she stated she had only been clean for six months with a few relapses even in that period. *Id*. The ALJ was careful to state "I'm not saying that I give *no* weight to Dr. Wolfe's opinion, and I will include some of his opinion in the residual functioning capacity assessed below, but I conclude that his opinion can only get limited weight because it relies too much on erroneous information." *Id*. (emphasis added) Additionally, the ALJ considered the plaintiff's general credibility issues, discussed below, in considering how to resolve the conflict in medical expert testimony. *Id*. at 24. Ultimately, the ALJ accepted Dr. Bruce's conclusion that plaintiff "gave a compromised effort on testing" and that her true intellectual and memory abilities were "probably in the low average range." *Id*.

While plaintiff does not agree with Dr. Bruce's conclusion, that does not mean the testimony of a medical expert should not constitute substantial evidence in this case. The ALJ evaluated the evidence

and concluded that Dr. Bruce's medical opinion better reflected plaintiff's ability to perform work in comparison to Dr. Wolfe, who was a nontreating physician selected by plaintiff. This Court finds that there was substantial evidence to support the ALJ's decision that plaintiff's IQ scores were the result of compromised effort and to discount them.

### B. Vocational Expert Hypothetical

Plaintiff also contends that because "[n]one of the hypothetical questions posed to the vocational expert took into account [the] low IQ scores," the "vocational expert's testimony has absolutely no evidentiary value," and thus the ALJ's reliance on the vocational expert's testimony constituted reversible error. Mtn. at 5. Plaintiff cites several cases which state that it is necessary for an ALJ to pose hypotheticals related to mental limitations where borderline intellectual functioning has been established. *See, e.g., Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997) (borderline intellectual functioning requires hypothetical question to vocational expert). Defendant contends that because the ALJ appropriately determined that plaintiff did not have borderline intellectual functioning, those cases are not on point and it was therefore not necessary for the ALJ to pose a hypothetical to the vocational expert assuming mental limitations. Opp. at 5.

When questioning a vocational expert for the purposes of determining a claimant's ability to perform specific jobs, the ALJ must include all relevant limitations and restrictions of the particular claimant. *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) (citing *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)). If the hypotheticals posed to the vocational expert are based upon incorrect assumptions, the vocational expert's testimony lacks evidentiary value. *Id*.

Here, the hypothetical questions posed to the vocational expert were based upon the limitations the ALJ found in his residual functioning capacity determination. Having already determined that there was substantial evidence to support the ALJ's conclusion that plaintiff had a "low average" intellectual capacity rather than borderline intellectual functioning, this Court finds that the ALJ appropriately questioned the vocational expert with relevant assumptions.

7

### C. ALJ's Credibility Determination of Plaintiff

Plaintiff contends that the ALJ "failed to provide proper credibility findings" because "the ALJ has not cited to any objectively verified evidence of malingering in the record." Mtn. at 7. However, the ALJ cited several reasons for discounting plaintiff's credibility that are supported by substantial evidence and plaintiff simply disagrees with those conclusions. Plaintiff disagrees with the ALJ's reasons because: (1) Dr. Wolfe's testimony supported her subjective complaints, (2) her criminal history is "part and parcel" of her mental impairment, and (3) her ability to perform daily activities "does not necessarily translate into the ability to perform these functions in a work setting on a consistent basis." Mtn. at 8-9.

The ALJ may consider the following factors in weighing a claimant's credibility: "the claimant's reputation for truthfulness; inconsistencies either in [her] allegations of limitations or between [her] statements and conduct; daily activities and work record; and testimony from physicians and third parties concerning the nature, severity, and effect of the alleged symptoms." *Light v. Social Sec. Admin*, 119 F.3d 789, 792 (9th Cir. 1997). Where there is no affirmative evidence showing that a claimant is malingering, "the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'" *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

Here, the ALJ provided several pieces of evidence to support his belief that the plaintiff was not credible beyond the three referenced by plaintiff. First, the ALJ determined that plaintiff's past criminal record of theft goes to credibility. AR at 24. Moreover, the ALJ questioned how plaintiff's admission of "petty theft" could support a $100 per day habit for 20 years. *Id*. Second, plaintiff admitted in her hearing that at her previous job she was fired for stealing, which also goes to credibility. *Id*. Third, the ALJ found that there were inconsistencies in her statements. For example, Dr. Wolfe was under the impression that plaintiff "had been clean and sober now for four years." *Id*. at 400. However, in her testimony only three days later in her hearing before the ALJ, plaintiff asserted she had last used heroin "[m]aybe like six months [ago], but it was just like once, and [then I was] back on methadone." AR at 39. Fourth, the ALJ determined that her daily activities, both as self reported and as declared by third parties "do not seem too debilitating" because they enable her to have some social life and occasionally permit her to "get[] out of the house." *Id*. at 24-25. Additionally, as this Court previously stated, the

8

ALJ's assessment of medical testimony as to her mental limitations was appropriately determined to be in the "low average" range rather than "borderline intellectual functioning" range.

The record clearly shows that the ALJ had Dr. Bruce's conclusions to support his finding that plaintiff gave a compromised effort on testing. This expert opinion constitutes affirmative evidence of malingering from which the ALJ could make his factual determination. Plaintiff implies that the ALJ should have questioned the expert opinion of Dr. Bruce simply because plaintiff's own expert testified plaintiff did not put forth a compromised effort on her IQ tests. However, as previously stated, the ALJ had substantial evidence to give less weight to Dr. Wolfe's testimony and to determine that plaintiff was not credible. Additionally, although plaintiff asserts that her criminal history is "part and parcel" of her disabilities, her criminal history was not the only basis for questioning her credibility.

Accordingly, this Court GRANTS defendant's cross motion for summary judgment, and DENIES plaintiff's motion for summary judgment.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendant's cross motion for summary judgment and DENIES plaintiff's motion for summary judgment. (Docket Nos. 15 & 16).

**IT IS SO ORDERED.**

Dated: June 22, 2010

SUSAN ILLSTON
United States District Judge